1997 ME 140

**Placido R. CAPUL, et al.,**

v.

**FLEET BANK OF MAINE.**

Supreme Judicial Court of Maine.

Argued May 6, 1997.

Decided June 30, 1997.

John J. Weltman (orally), Lawson & Weitzen, Boston, MA, James G. Lynch, Paine, Lynch & Harris, Bangor, for plaintiff.

Bernard J. Kubetz (orally), Thad B. Zmistowski, Eaton, Peabody, Bradford & Veague, Bangor, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, DANA, and LIPEZ, JJ.

DANA, Justice.

[¶ 1] Placido "Paul" Capul and his corporation, Elpla, Inc., (hereinafter referred to collectively as Capul) appeal from the judgment entered in the Superior Court (Penobscot County, *Marden J.*) on a jury verdict finding Fleet Bank of Maine not liable to Capul for fraudulent misrepresentation, fraudulent nondisclosure, conversion, wrongful interference with an advantageous relationship, and negligent misrepresentation. Capul contends that the court erred when it (1) concluded that Fleet did not owe him a duty of care in regard to a 1988 subordination agreement; (2) allowed Fleet to introduce a document as a business record; (3) allowed Fleet to ask Capul about his payment of taxes in prior years; (4) refused to submit to the jury

questions of fact related to his claim for rescission of the subordination agreement; (5) excluded the testimony of Capul's expert; (6) refused to provide the jury with his proposed instructions regarding negligent misrepresentation and breach of contract; and (7) instructed the jury that Capul must show clear and convincing evidence of fraud to recover on his claims of interference with an advantageous relationship and conversion. We affirm the judgment.

[¶ 2] From the parties' briefs and portions of the record made available to the Court, the facts are as follows. In 1986 Capul sold a car dealership to Hervey and Cynthia Triplett, accepting their note for $449,289 secured by a second mortgage on the dealership. By 1988 Fleet had made several substantial loans to the Tripletts to finance other business ventures including a $500,000 line of credit secured by a $500,000 savings account in the name of the Goss Trust. The Tripletts, executors of the Goss Estate, needed cash to pay estate taxes and asked Fleet to release the Goss Trust savings account. Fleet agreed to the release in exchange for a first mortgage on the Tripletts' car dealership that had recently been appraised at a value of $1.1 million. The Tripletts in turn asked Capul to subordinate his mortgage on the dealership. Before agreeing to the subordination, Capul alleges he spoke with his former attorney, Paul Rudman, who, according to Capul, was acting as Fleet's attorney at the time.[1] After his meeting with Rudman and his review of the recent appraisal, Capul agreed to subordinate his mortgage, believing that the dealership's value was sufficient to secure Fleet's first mortgage of $600,000 as well as his second mortgage on the property.[2]

[¶ 3] On July 12, 1988, the Tripletts executed a mortgage and security agreement with Fleet, giving the bank a first mortgage on the car dealership for $3 million. On the same day, Capul signed a subordination agreement with the Tripletts. The agreement did not specify the amount of Fleet's first mortgage to which Capul's interest

would be subordinate. In September 1989 the Tripletts sold the dealership for $1,169,609. Fleet took all the proceeds from the sale.

[¶ 4] After the sale of the dealership Capul sought additional security from the Tripletts and acquired a third mortgage on the Tripletts' residence. Fleet held the first two mortgages on the property. In 1991 Fleet foreclosed on its second mortgage and Capul paid the $130,000 outstanding on that mortgage. After the foreclosure, Capul paid Fleet an additional $60,000 that Fleet claimed was still outstanding on its first mortgage. According to Capul, he later discovered that Fleet's first mortgage had already been satisfied by the Tripletts.

[¶ 5] The court entered a judgment as a matter of law on Capul's claim for negligence because the court concluded that Fleet had no duty to Capul in regard to the subordination agreement. The jury returned a verdict in favor of Fleet on all the remaining counts.

## I.

[¶ 6] Capul contends the court erred when it concluded that Fleet did not owe a duty of care to Capul and that the court should not have entered a judgment as a matter of law for Fleet on his negligence claim. He argues that he acquired the status of a surety when he subordinated his mortgage on the dealership to Fleet's first mortgage, and that Fleet therefore had a duty to disclose to him information regarding the nature of the risk he was assuming.

[¶ 7] "Whether one party owes a duty of care to another is a matter of law." *Fish v. Paul,* 574 A.2d 1365, 1366 (Me.1990) (citing *Joy v. Eastern Me. Med. Ctr.,* 529 A.2d 1364, 1365 (Me.1987)). On the facts of this case, we cannot say the court erred by concluding that Fleet did not owe a duty of care to Capul as a result of his subordination agreement with the Tripletts. "A surety is one who undertakes to perform in the event of default by the principal." *Ford Motor*

---

1. Rudman testified that he has no recollection of such a meeting.

2. Capul conceded at oral argument that he consulted another attorney who advised him not to subordinate his interest in the dealership.

*Credit Co. v. Machias Ford, Mercury, Inc.*, 509 A.2d 658, 659 (Me.1986) (citing *Read v. Cutts*, 7 Me. 186, 189 (1831)). Capul's subordination agreement with the Tripletts merely changed his priority; he did not promise Fleet that Fleet could pursue him if the Tripletts failed to fulfill their obligation to the bank and did not undertake to pledge his property as a guarantee for the Tripletts' debt. Capul simply allowed Fleet to move ahead of him in regard to the right to foreclose on the dealership.

## II.

[¶ 8] Capul contends that the court erred when it allowed Fleet to introduce into evidence a memorandum dated August 1989 from Fleet's file on the Tripletts that lists the outstanding debt on three of the Tripletts' notes. He argues that Fleet did not lay an adequate foundation to satisfy Maine Rule of Evidence 803(6) and that the list was therefore inadmissible hearsay.

[¶ 9] Rule 803(6) provides that the following is not excluded by the hearsay rule:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regular conducted business, and if it was the regular practice of that business to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. . . .

We review the court's findings regarding the foundational elements necessary to Rule 803(6) for clear error. *Adamatic v. Progressive Baking Co.*, 667 A.2d 871, 874 (Me.1995).

[¶ 10] Here, the court admitted the memorandum over Capul's objection after hearing the testimony of Bill Lucy, an assistant vice-president at Fleet, who stated that the memorandum was the type of record regularly kept and prepared by the bank, that the document reflected the interest due on the Tripletts' "floor plan debt," that Lucy was one of the people involved in tracking the Tripletts' floor plan debt, that it was Fleet's policy to prepare such memos to reflect the amount of unpaid interest on such debts, and that he believed the memo was created by himself or by one of the two other Fleet employees who were responsible for dealing with the Tripletts' debt. Lucy's testimony provides competent evidence on which the court could have found that the elements of Rule 803(6) were satisfied.

## III.

[¶ 11] Capul asserts that the court erred when it allowed Fleet to ask him questions about his income and payment of federal income taxes in prior years. He argues his testimony regarding the payment of taxes was not probative of truthfulness or untruthfulness and, alternatively, even if probative, the testimony was unduly prejudicial and should have been excluded pursuant to Maine Rule of Evidence 403.[3]

[¶ 12] Maine Rule of Evidence 608(b) gives the trial court discretion to allow inquiry into specific instances of a witness's conduct if such conduct is probative of truthfulness or untruthfulness.[4] The admissibility

---

**3.** The substance of Capul's testimony was that he had purchased about 100 used cars from auctions across the country and then sold the cars, making about $1000 per car in profits. According to his deposition testimony that he confirmed at the trial, he stated that he did not have to share this income with anyone and that it was "tax-free income that [he did not] have the opportunity to earn[.]" He also testified at the trial, in response to questions from his own attorney, that he did not pay taxes on such income because it was offset by other business losses and that he had never lied on his income tax returns.

**4.** Rule 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

of evidence pursuant to Rule 608(b), however, is also subject to the balancing under Rule 403.[5] *State v. Zadakis,* 511 A.2d 1074, 1075 (Me.1986) (quoting *United States v. Atwell,* 766 F.2d 416, 420 (10th Cir.1985), *cert. denied,* 474 U.S. 921, 106 S.Ct. 251, 88 L.Ed.2d 259 (1985)). Here, we cannot say the court erred in finding that Capul's nonpayment of income taxes in prior years was probative of untruthfulness, or that the court abused its discretion in determining that the probative value of his testimony was not "substantially outweighed by the danger of unfair prejudice." M.R.Evid. 403. Furthermore, as noted by the trial court, Capul invited Fleet's questions about his character for truthfulness by eliciting testimony from another witness, Paul Rudman, that Capul was generally a truthful person.

### IV.

[¶ 13] Capul asserts that the court erred by refusing to submit to the jury questions of fact related to Capul's claim for rescission of the subordination agreement with the Tripletts. Capul argued at the trial that he was entitled to rescind the agreement because the Tripletts fraudulently provided erroneous information to Capul to induce him to sign the agreement.

[¶ 14] "It is well settled that rescission is an equitable remedy." *Harriman v. Maddocks,* 560 A.2d 11, 13 (Me.1989) (citations omitted). Contrary to Capul's contentions, the court, not the jury, determines factual questions relevant to a claim for equitable relief. *See, e.g., Harriman,* 560 A.2d at 12–13; *Bowden v. Grindle,* 651 A.2d 347, 350 (Me.1994). Thus, the court did not err by refusing to submit factual questions to the jury regarding the existence and terms of the agreement between Capul and the Tripletts.

### V.

[¶ 15] We do not address Capul's remaining contentions because he has not submitted an adequate record for review of those issues. *See Martin v. Scott Paper Co.,* 434 A.2d 514, 518 (Me.1981); M.R.Civ.P. 74.

The entry is:

Judgment affirmed.

---

**5.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.